STATE of Iowa, Appellee,

v.

David Alan SCHLICK, Appellant.

No. 59290.

Supreme Court of Iowa.

Aug. 31, 1977.

Emmit J. George, Jr., Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Richard H. Doyle, IV, Asst. Atty. Gen., and Jack W. Dooley, County Atty., for appellee.

Heard before MOORE, C. J., and MASON, LeGRAND, REES and UHLENHOPP, JJ.

LeGRAND, Justice.

Defendant was convicted of delivery of a Schedule I controlled substance, to-wit: MDA (methylenedioxamphetamine) in violation of § 204.401(1), The Code, 1975. After an accommodation hearing, defendant was sentenced to serve a period of one year in the Johnson County jail and fined $500. Defendant appeals from this judgment, and we affirm.

Defendant raises these issues for review:

1. The State's unreasonable delay in arrest and prosecution entitles him to a dismissal;

2. He is entitled to a reversal because of prejudice resulting from the State's refusal to produce a paid informant as a witness at trial or, alternatively, to disclose his identity to defendant;

3. The trial court erred in refusing to grant defendant's request for a "missing witness" instruction at trial.

Before discussing the issues raised, we outline the background facts which led to defendant's conviction. We state them in the light most favorable to the State.

Roger Timko, a special agent of the Iowa Division of Narcotic and Drug Enforcement, was working on narcotic violations in the Iowa City area. He enlisted the aid of a paid informant identified at first in the record only as Kip, and later as Kip Moore. Kip made a contract with Michael Remmers, suspected of dealing in drugs. Kip introduced Agent Timko to Remmers, representing the latter as one from whom Timko could buy drugs.

On April 11, 1975, Remmers arranged a meeting at defendant's apartment. Agent Timko, defendant, Remmers, Kip, and Kip's girlfriend, Stacey, were present. At this meeting, defendant sold a quantity of MDA to Timko for $400. Remmers stayed behind when the others left, and defendant gave him $25, which he says was the entire profit on the transaction.

Eight months later defendant was arrested and charged with the April 11, 1975, delivery. He says this delay was unreasonable and that it seriously prejudiced his ability to prepare and present a defense because his memory of the events has been dulled; two "possible" critical witnesses (Kip and Stacey) are no longer available; and Agent Timko "must now rely on notes as refreshers to identify defendant and to recall the specific circumstances of the alleged offense."

I. This is not a claim that defendant was denied speedy indictment or speedy trial under § 795.1 or § 795.2, The Code. It is, rather, a due process claim under the 5th Amendment to the federal constitution

based on alleged unreasonable delay between the time the offense was committed and the time defendant was arrested and charged with the crime. It looks for support principally to *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468, 480–482 (1971).

*Marion* swept away the notion that the statute of limitations was the sole standard upon which to determine whether prosecution was timely brought. In that case the Supreme Court of the United States said:

"[I]t is appropriate to note here that the statute of limitations does not fully define the appellee's rights with respect to the events occurring prior to indictment. Thus, the government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellee's right to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused."

A more recent case, *United States v. Lovasco*, —— U.S. ——, at ——, 97 S.Ct. 2044, at 2049, 52 L.Ed. 752, decided June 9, 1977, announces that same rule. *Lovasco* emphasizes that actual prejudice must be shown but that this alone is not enough. The reasons for the delay must also be considered. There the court said:

"We are to determine only whether the actions complained of—here, compelling respondent to stand trial after the Government delayed indictment to investigate further—violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.' "

We recently considered this matter in *State v. Burrell*, 255 N.W.2d 119 filed June 29, 1977. It is unnecessary to repeat what we said in *Burrell*. We reiterate the principles announced there and rely on the same authorities in support of our present opinion. We pointed out there, relying on both *Marion* and *Lovasco*, that a determination of this question involves "a balancing test in which the trial court weighs the reasona-

bleness of the delay against the prejudice to the defendant."

We also pointed out that the prejudice upon which a defendant relies for relief must be specifically shown:

"A mere claim of general inability to reconstruct the events of the period in question is insufficient to establish the requisite prejudice for reversal on denial of due process * * * "

From these cases, it is apparent defendant must establish two factors before he can demonstrate his right to relief:

1. The eight-month delay must be unreasonable and without justification; and

2. The delay must have resulted in actual prejudice to his defense.

■ There may be many sound reasons for investigative delay, particularly in drug cases which frequently involve related activities by a number of suspects. Sometimes a quick arrest of one would prevent apprehension of the others. Both *Marion* and *Lovasco* recognize that prosecutors must be allowed wide discretion in deciding when the time is ripe for bringing charges. This must be decided on a case-by-case basis. *Lovasco* specifically refused to lay down any guidelines by which to decide such matters except to say the State should not be allowed to use the delay merely to obtain a tactical advantage over defendant. In *Lovasco* the court said:

"In *Marion* we conceded that we could not determine in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions. 404 U.S. at 324, 92 S.Ct. [455] at 465. More than five years later, that statement remains true. Indeed, in the intervening years so few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay. We therefore leave to the lower courts, in the first instance, the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases."

In the present appeal we need not undertake this task because we rest our decision on the absence of actual prejudice. The record utterly fails to support defendant's argument that his memory of events was impaired by the delay or that Agent Timko's identification testimony was in any way affected.

Furthermore, the most serious charge—that he was denied the testimony of two vital witnesses—collapses in the face of the record from which we now quote. The following is taken from defendant's direct examination:

"Q. Why don't you tell the jury what you do remember—that you can remember of your own memory [about this buy]?

"A. I remember at least maybe two or three telephone calls from Remmers [defendant's alleged associate] to get him some drugs.

"Q. What did he say in these phone calls?

"A. He wanted from me—if I could get him some drugs to sell so he could make some money.

"Q. When were these phone calls made?

"A. It would have been the day before and one that day of the incident.

"Q. Could there have been more phone calls?

"A. There could have been.

"* * *

"Q. I'm wondering what went through your mind when you were talking to him on the telephone and why—you obviously did get some drugs—and why you got them?

"A. Well, I didn't really want to but I didn't know what would happen if I didn't. I guess you could say I felt very uneasy and probably afraid.

"Q. What were you afraid of?

"A. Well, I could have been hurt; and I didn't know for sure, but I could have been if I didn't do what I did to get the drugs.

"Q. You're speaking again from your memory, is that right?

"A. That's correct.

"Q. What did you do after you got these phone calls from Remmers?

"A. Well, I though about it and then I got the drugs.

"Q. How did you get them?

"A. Well, as being a student here and having been here for a long time, five years, I would naturally—I knew somebody who I could get some from, somebody I was—a friend that I knew.

"Q. When did you get the drugs then?

"A. I couldn't remember for sure. It would either had to have been the night before or that day, the morning.

"Q. So you knew someone you could go to and get them and you went and got them, is that right?

"A. That's correct.

"Q. What about the morning of April 11th, do you remember anything specifically about that morning?

"A. Just that Mr. Remmers called and asked me if I had the drugs yet.

"Q. What did you tell him?

"A. I said at that time I did.

"Q. What happened then that you can remember?

"A. Well, in the conversation he had said that he had already got him a buyer for this and asked me how much it was going to cost him, and I told him I'd give it to him for what it cost, $375, because he wanted to make some money for himself.

"Q. So then what happened, did he come over?

"A. Later he did with the agent and two black people [Kip and Stacey].

"Q. Why don't you tell the jury what you remember then about him coming over?

"A. I don't remember much specifically about it, just that they came over; and I can't deny what Mr. Timko said because that must have been what happened, I don't know. I don't remember for sure, but I do

remember that after they did leave that Mr. Remmers stayed behind and collected his $25 which he then left soon after.

"* * *

"Q. Which $25 is this that you're talking about?

"That would have been the balance from the $400. I told him I'd give it to him for what it cost. $375. And he set up the deal for $400."

We believe the foregoing refutes defendant's claim he cannot remember the details of the offense. Indeed he remembers them with great clarity and his testimony corroborates Agent Timko in almost every important fact. Defendant equivocates only on the actual physical delivery of the MDA. Even this he did not deny, but contended himself with saying "it must have happened" as Agent Timko said it did.

In the face of defendant's testimony, plus other equally damaging evidence from defendant's roommate, a witness called by the defense, we find no merit in his claim the absence of Kip and Stacey prejudiced him. Surely we are not to assume they would contradict defendant's own admissions. Their only importance to the defense might have been on the accommodation hearing. However, that terminated in defendant's favor. Obviously, their absence did not result in actual prejudice on that issue.

We hold defendant has failed to show he was denied due process because of the eight-month delay in starting prosecution.

II. Much of what we said in Division I applies to the claim defendant was wrongfully deprived of the names and whereabouts of Kip and Stacey. The trial court overruled defendant's motion to compel the State to divulge that information, relying on *State v. Lamar*, 210 N.W.2d 600, 602 (Iowa 1973) and *State v. Battle*, 199 N.W.2d 70, 71 (Iowa 1972).

■ Both these cases hold, as do the authorities they cite, that ordinarily the identity of informers should be divulged when the informant participated in, or was present at, the offense. We do not believe *Lamar* or *Battle* support the trial court's order.

■ However, in the present case, the record does not show the State could produce the witnesses. They had left the state and had gone to Minnesota a day or two after the offense. While one may speculate about the ability of the State to locate and bring back the two witnesses, such speculation should not be a basis for reversing the trial court. Defendant has failed to show the State was in a position to produce Kip and Stacey at trial.

Furthermore, for reasons already stated, defendant suffered no prejudice because the informant did not testify. Any error in this regard would be harmless.

■ III. We hold against defendant, too, on his last claim, where he asserts it was error to refuse his requested "missing witness" instruction. Under some circumstances the jury may draw an inference that the testimony of an uncalled witness would be adverse to the party who fails to call such witness. *See State v. Turley*, 239 N.W.2d 544, 545 (Iowa 1976).

Under this record defendant was not entitled to the requested instruction and the trial court was right in refusing to give it.

AFFIRMED.